UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARK CHESLER,                             )        CASE NO.  1:13CV40
                                          )
                                          )
                    PLAINTIFF,            )        JUDGE SARA LIOI
                                          )
vs.                                       )
                                          )        MEMORANDUM OPINION
                                          )
                                          )
CITY OF FAIRVIEW PARK, et al.,            )
                                          )
                                          )
                    DEFENDANTS.           )

Before the Court is the joint motion of defendants, City of Fairview Park ("the City"), John Martin, Jeffery Jurcak, and Erich Upperman, for summary judgment (Doc. No. 57). Plaintiff Mark Chesler opposes the motion (Doc. No. 68), and defendants have filed a reply (Doc. No. 71).

I.  **BACKGROUND**

There is very little agreement between the parties as to the events that transpired on November 29, 2010 in the City of Fairview Park, Ohio. In fact, there is such a divergence in the representation of the facts that the Court must tell the story twice, once from defendants' perspective and a second time from plaintiff's point of view.

A.       *Defendants' Version of Events*

According to defendants, Martin, a twenty-six year veteran of the Fairview Park Police Department, was traveling southbound on West 210th Street on his way back to the police station after testifying in court in an unrelated matter. (Deposition of John

Martin, Doc. No. 44 at 365-66.) He was wearing his police uniform but was driving his personal vehicle. (*Id.* at 366.) He observed plaintiff jogging northbound in the southbound lane on West 210th. (*Id.* at 368.) Plaintiff appeared to be "staggering" and "flailing[,]" and he was far enough away from the curb that an approaching vehicle had to veer left of the center line in order to avoid hitting plaintiff. (*Id.* at 368-69.) Martin was also forced to maneuver his vehicle left of center to miss plaintiff. (*Id.* at 368, 371.)

Martin drove around the block, parked in a driveway, exited his vehicle, and approached plaintiff (*id.* at 372-74), who had, by this point, moved to the sidewalk and was proceeding at a "fast walk." (*Id.* at 373.) Martin admits that plaintiff was no longer flailing or staggering. (*Id.*) Martin informed plaintiff that he was a police officer, and asked plaintiff what he was doing. (*Id.* at 374-75.) Plaintiff advised Martin that he was on his way to catch a bus. (*Id.* at 375.) Martin followed up by asking plaintiff if he was okay. (*Id.*) Martin did not recall plaintiff's response, but he did remember that plaintiff began to laugh. (*Id.*) He also remembered that when he asked plaintiff to perform some field sobriety tests, plaintiff became "very angry[,]" exhibiting "mood swings[.]" (*Id.* at 375, 409-10.) Nevertheless, Martin concedes that he did not smell alcohol on plaintiff's breath. (*Id.* at 375-76.) Martin also admits that plaintiff's eyes were not bloodshot, and plaintiff was not slurring his words. (*Id.* at 384.)

The first sobriety test Martin asked plaintiff to perform was the "finger dexterity" test, in which Martin directed plaintiff to count aloud on his fingers from one to four, then four to one, using the thumb as a counter. (*Id.* at 376.) Before having plaintiff attempt the test, Martin demonstrated the proper procedure. He did not

remember plaintiff requesting that he repeat the demonstration, and added that he would have repeated it upon request. (*Id.*) Plaintiff's attempt was less than successful, as plaintiff "just kind of ran his thumb over his other fingers and ran them back and then miscounted on the way[.]" (*Id.* at 377.) According to Martin, plaintiff had no more luck on the remaining tests, as plaintiff was unable to tilt his head back without swaying "a little bit" from side to side and was unable to follow the officer's pen with his eyes. (*Id.* at 378-80, 388-89.) Plaintiff also refused to perform the "walk and turn" test and started to laugh again, insisting that he had to catch a bus. (*Id.* at 383.)

Due to plaintiff's poor performance on the field sobriety tests and inappropriate behavior during the testing, coupled with his "staggering" and "flailing" in the street, Martin concluded that plaintiff was under the influence of a foreign substance other than alcohol. (*Id.* at 377, 380-81.) Martin asked plaintiff if he could get someone to pick him up, but plaintiff refused to even attempt to contact someone. (*Id.* at 382.) Martin then informed plaintiff that he was under arrest for engaging in disorderly conduct while intoxicated. (*Id.* at 382, 384.) Martin explained that, by this point, he believed that he had no choice but to arrest plaintiff because he posed a danger to himself and others. (*Id.* at 410.)

After coming to this conclusion, Martin used his cell phone to call the police station. (*Id.* at 384.) Defendant Jurcak—a patrol officer with the Fairview Park Police Department—arrived at the scene in a marked police vehicle. (*Id.* at 385; Excerpts from Deposition of Jeffrey Jurcak, Doc. No. 57-3 at 999.) From Jurcak's initial observation of plaintiff's interactions with Martin, Jurcak concluded that something was

3

"not right" with plaintiff. (*Id*. at 1000.) Specifically, Jurcak noted that plaintiff's coat was wet, though it was not raining, and he further observed that plaintiff was not "making a lot of sense" when he was speaking with Martin. (*Id*.) Martin ultimately conveyed his own observations of plaintiff's behavior and instructed Jurcak to take custody of plaintiff. (*Id*. at 1000, 1006.) Plaintiff was handcuffed and transported to the police station in Jurcak's cruiser. (*Id*. at 1006.)

Once inside the station, Jurcak shepherded plaintiff into the booking area (*id*. at 1009), and Martin informed then Lieutenant Upperman[1] of the reason he arrested plaintiff. Martin suggested to Upperman that somebody needed to come and pick plaintiff up. (Doc. No. 44.at 393.) According to Martin, plaintiff was then given a phone— possibly plaintiff's own cell phone—for the purpose of contacting someone to take him home. (*Id*.) Rather than arranging for a ride home, plaintiff placed calls to the City's mayor, prosecutor, and law director complaining about the treatment he was receiving from the Fairview Park police. (*Id*. at 393-94.) Plaintiff also contacted his brother, Stan Chesler, who is a lawyer in Boston. (*Id*. at 394.) John Castele, the Assistant Law Director for the City of Fairview Park, testified that he eventually spoke by phone with Stan Chesler and advised him to contact the police department to arrange for his brother's release into the custody of a responsible person. (Excerpts from Deposition of John Castele, Doc. No. 57-6 at 1048, 1051-52.)

---

[1] At all times relevant to the second amended complaint, defendant Upperman was a lieutenant with the Fairview Park Police Department. (Excerpts from Deposition of Erich Upperman, Doc. No. 57-4 at 1013.) On October 21, 2013, Upperman was elevated to the position of chief. (*Id*.)

In his deposition, Martin testified that it is departmental policy that when someone is picked up on suspicion of being under the influence of drugs or alcohol, and found to pose a danger to himself and/or others, that individual may only be released when he regains sobriety or when someone agrees to assume responsibility for the individual's wellbeing. (Doc. No. 44 at 401; *see also id.* at 403-04 [discussion of procedure].) Upperman confirmed that this is the practice followed by the Fairview Park Police Department. (Doc. No. 57-4 at 1019.)

Martin prepared a citation that he intended to serve on plaintiff, charging plaintiff with violating Fairview Park Codified Ordinance §509.03(b)(2), "Disorderly Conduct; Intoxication." (Doc. No. 44 at 399.) However, Martin testified that he was directed by then Police Chief Patrick Nealon not to serve the citation upon plaintiff because there was a concern that plaintiff's abnormal behavior might have been caused by a medical or mental problem. (*Id.* at 412.) Ultimately, plaintiff was released into the custody of an acquaintance of plaintiff, Wallace Johnson. (*Id.* at 413.)

B.      *Plaintiff's Version of Events*

As alluded to previously, plaintiff recalls the events of November 29, 2010 much differently. Plaintiff agrees that he was initially traveling north on West 210th Street, but insists that he was "hugging the curb, watching carefully for on-coming traffic, and maintaining an efficient, rhythmic cadence." (Amended Affidavit of Mark Chesler,

5

Doc. No. 70 at ¶ 14.)[2]  He denies that he was "'staggering' or 'flailing' [his] arms in any manner." (*Id.*)

Plaintiff remembers being "abruptly and unexpectedly" confronted by Martin and ordered to stop his run. (*Id.* at ¶ 15.) According to plaintiff, Martin "bellicosely and belligerently" ordered plaintiff to join him on the sidewalk, and plaintiff complied. (*Id.* at ¶ 16.) Martin then demanded that plaintiff produce identification and disclose his destination. (*Id.*) Plaintiff was, again, compliant, tendering his Ohio non-driver identification card and informing Martin that he was running to catch a bus. (*Id.*) Plaintiff waited while Martin walked to his vehicle. Once out of earshot of plaintiff, Martin participated in a telephone conversation. (*Id.* at ¶¶ 17-18.)

When Martin returned to plaintiff's location on the sidewalk several minutes later, he shined a flashlight in plaintiff's eyes. (*Id.* at ¶¶ 16, 19.) According to plaintiff, the following occurred:

> Sergeant Martin then abruptly ran his thumb over his forefingers in a series of cursory, convoluted digital maneuvers and asked me to replicate the stunt. I requested Sergeant Martin repeat the unfamiliar finger manipulations and he balked.
>
> Rapidly brandishing his pen across my field of vision in an arcing motion at a distance of approximately five feet, Sergeant Martin performed a perfunctory, adulterated HGN test on a subject deprived of prescription eyeglasses.
>
> Sergeant then brusquely ordered me to tilt my head back. I complied with his request but kept a wary eye on Sergeant Martin as he was seething and

---

[2] Plaintiff avers that he is "a former competitive marathon runner—a veteran of the Cleveland, Boston, Baltimore, Rochester New York; Coudersport, Pennsylvania; Lowell, Massachusetts and Saco, Main marathons—and was on the date of the incident, and remain[s] to present, an active runner." (*Id.* at ¶ 5, punctuation in original.)

intemperate, and I was concerned for my safety. This entire exercise took approximately five seconds.

The aggregated, elapsed time for all these truncated exercises was a combined total of a minute.

Without explication, Sergeant Martin stated I was under arrest and returned to his vehicle.

(*Id*. at ¶¶ 20-24.)

Plaintiff categorically denies that he was ever asked by Martin to perform a "walk and turn" test, that he "laughed during or in reaction to the field sobriety tests[,]" or that Martin offered him the opportunity to have someone pick him up and take him home. (*Id*. at ¶¶ 25-27.) He further denies that Martin ever told him that he thought that plaintiff was running erratically in the street, or that he believed that plaintiff posed a danger to himself or others. (*Id*. at ¶ 29.) Instead, plaintiff insists that he was "running with a steady, measured gait and posed no danger to [himself] or to others." (*Id*.)

According to plaintiff, after Martin returned to his vehicle for a second time, plaintiff contacted Upperman and informed him that Martin was "off his rocker," and that Martin was arresting him without cause. (*Id*. at ¶ 28.) Plaintiff then placed a call to his doctor's office to cancel his medical appointment. (*Id*. at ¶ 30.) When Martin returned to where plaintiff was waiting on the sidewalk, he noticed that plaintiff's cell phone was out and "anxiously inquired if [plaintiff] was recording [Martin]." (*Id*. at 32.) Plaintiff informed him that he was not recording the encounter. (*Id*.)

When Jurcak arrived at the scene, Jurcak approached plaintiff, handcuffed him, and placed plaintiff in the back of his police cruiser. In answer to Jurcak's query as to why plaintiff's coat was wet, plaintiff explained that he had "prematurely" removed

the jacket from the dryer. (*Id.*) Upon arrival at the police station, Jurcak seated plaintiff in the booking room. Jurcak did not respond to plaintiff's insistence that he was being arrested without cause. (*Id.* at ¶ 33.)

       While still in the booking room, plaintiff used his cell phone to contact his brother. At the conclusion of this phone call, Jurcak ordered plaintiff to place his cell phone on the booking room counter. Plaintiff did so. (*Id.* at ¶ 34.) Plaintiff was then forced to watch his phone ring several times. The first call, placed by his friend Jack Rolko, went unanswered. (*Id.* at ¶ 35.) When the cell phone rang a second time, plaintiff retrieved the cell phone and had a second conversation with his brother. (*Id.* at ¶ 36.) Stan informed plaintiff that he (Stan) had left telephone messages for the City's law director and prosecutor. Plaintiff denies that he personally called either of these individuals. (*Id.*)

       Approximately one hour after he arrived at the station, plaintiff was told by Jurcak that he could go home if someone would pick him up. According to plaintiff, this was the first time *anyone* apprised him that he could arrange for someone to take him home. (*Id.* at ¶ 37.) Plaintiff admits that, shortly thereafter, he called the mayor's office and left a message to the effect that he had been arrested without cause. (*Id.* at ¶ 39.)

       Within 15 minutes of leaving the message for the mayor, plaintiff states that Martin "opened the booking room door and barked at [him] from the adjoining locker room: 'Calling the mayor's office!!! That's it, you've had it!!!'" (*Id.* at ¶ 41, punctuation in original.) "Failing to coerce a blood sample, Sergeant Martin ordered [plaintiff] to disrobe and don dark green prisoner garb. Fuming, Sergeant Martin escorted [plaintiff] into a cell in the Fairview Park jail's sealed cell block and locked the cell

door." (*Id*.) When plaintiff asked for access to a phone, Jurcak "responded curtly: 'This is not the Holiday Inn.'" (*Id*. at ¶ 43.)

Plaintiff remained locked in the cell—without access to a phone—for approximately three hours, until an officer unlocked the door and afforded plaintiff access to a phone. (*See id*. at ¶¶ 44-45.) After several failed attempts, plaintiff managed to reach Wallace Johnson, a "retired assistant Oberlin postmaster, and longtime friend[,]" and, at 9:30 pm, plaintiff was informed that Johnson had arrived to collect him. (*Id*. at ¶¶ 45-46.) In the jail's vestibule, "Sergeant Martin sophomorically mimed crude, graphic hand gestures simulating sexual intercourse. As [plaintiff] attempted to retrieve [his] inventoried belongings . . . Upperman—who[m] [plaintiff] had never previously encountered—insolently called [him] a 'dickhead,' citing 'fucking calls' from unspecified persons." (*Id*. at ¶ 46.) In all, plaintiff spent a little less than seven hours in police custody. (Deposition of Mark Chesler, Doc. No. 51 at 794 [arrived at 3:21 pm], 822 [plaintiff departed "just prior to ten o'clock"].)

On November 29, 2012, plaintiff brought suit against defendants in the Cuyahoga County Court of Common Pleas. Defendants removed the case to this Court on January 8, 2013. (Notice of Removal, Doc. No. 1.) In his second amended complaint, plaintiff raises claims for the deprivation of the following constitutional rights: "Freedom of Movement and Liberty[,]" equal protection, due process, and "Civil Rights[.]" (Second Amended Complaint, Doc. No. 16-1 at 124-25.) The Court construes these claims as arising under 42 U.S.C. § 1983. *See Meals v. City of Memphis*, 493 F.3d 720, 727 (6th Cir. 2007) ("Section 1983 is not itself a source of any substantive rights, but instead

9

provides the means by which rights conferred elsewhere may be enforced.") (cite omitted); *Krantz v. City of Toledo Police Dep't*, 197 F. App'x 446, 452 (6th Cir. 2006) ("To establish a claim under § 1983, the plaintiff must identify a right secured by the Constitution or laws of the United States and the deprivation of that right by a person acting under color of state law.") (cite omitted). Plaintiff also raises state law claims for abuse of process and intentional infliction of emotional distress. He seeks declaratory relief, as well as compensatory and punitive damages, attorney's fees, and costs. (Doc. No. 16-1 at 126, 128.)

## II. Standard of Review

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to

10

interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue

11

of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

**III. DISCUSSION**

Plaintiff contends that his initial stop by Martin, his arrest, and his detention by defendants violated his constitutional rights. Defendants insist that there was probable cause to arrest and detain plaintiff, and that, in any event, there is no municipal liability and the officers are entitled to qualified immunity.

*A. Fourth Amendment Claim*

In Count I of the second amended complaint, plaintiff alleges that he was deprived of his right to "freedom of movement and liberty[.]" (Doc. No. 16-1 at ¶ 39.) Such an accusation, in essence, sets forth a wrongful seizure claim under the Fourth Amendment. *See Brower v. County of Inyo*, 489 U.S. 593, 597, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989) (The Fourth Amendment protects against unreasonable government seizures that terminate an individual's "freedom of movement through means intentionally applied.") (emphasis omitted).

In their original motion, defendants do not argue that Martin had reasonable suspicion to initially stop plaintiff and inquire into his well-being, raising this argument, for the first time, in their reply brief. (Doc. No. 71 at 1703-1705.) Generally, a defendant waives an argument by not raising it in his motion. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (collecting cases); *see, e.g., Hunt v. Big Lots*

12

*Stores, Inc.*, 244 F.R.D. 394, 397 (N.D. Ohio 2007) (defendants waived the issue of good faith by not raising it in their motion for summary judgment, reserving the argument for their reply brief). Nevertheless, given the fact that plaintiff fully addressed this standard in his opposition brief, and inasmuch as any evaluation of the constitutionality of plaintiff's encounter with members of the Fairview Park Police Department must start with the initial stop by Martin, the Court finds that this is the appropriate place to begin its analysis.

     1. <u>The Initial Stop and Reasonable Suspicion</u>

    The Fourth Amendment allows officers to briefly detain individuals without probable cause if they have a reasonable suspicion, based on a totality of the circumstances and their experience, that criminal activity may be underway. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *see United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.") (cites omitted). A lesser standard than probable cause, a reasonable suspicion exists when an officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry*, 499 U.S. at 21. Where a reasonable suspicion exists, an officer may temporarily detain an individual "'to investigate the suspicious circumstances.'" *United States v. Heath*, 259 F.3d 522, 528 (6th Cir. 2001) (quoting *United States v. Hurst*, 228 F.3d 751, 756-57 (6th Cir. 2000)).

13

Defendants argue that Martin had a reasonable suspicion that plaintiff had violated Fairview Park Codified Ordinance § 509.03(b), which provides, in relevant part: "No person, while voluntarily intoxicated shall do either of the following: . . . (2) Engage in conduct or create a condition that presents a risk of physical harm to the offender or another, or to the property of another." Section 509.03(d) instructs: "If a person appears to an ordinary observer to be intoxicated, it is probable cause to believe that person is intoxicated for purposes of subsection (b) hereof."

Martin testified that he made the initial decision to stop plaintiff and require him to perform some field sobriety tests based upon plaintiff's behavior as he ran in the street. As set forth above, Martin maintains that he observed plaintiff "staggering," "flailing" his arms, and running too far away from the curb. These observations led him to believe that plaintiff might be under the influence of a foreign substance, and that he might be a danger to himself and others. (Doc. No. 44 at 370-72.)

Plaintiff, however, vehemently denies that he was running away from the curb, or that he was staggering or flailing his arms as he ran. He insists that he was "hugging the curb" and lawfully running in a straight line in the street with a smooth, controlled cadence. In his deposition, Martin conceded that it is lawful to safely run in the street, and that he would not have stopped Martin if he had been running near the curb. (Doc. No. 44 at 370.)[3]

_____

[3] Martin explained: "I've seen runners in the street and if they're—again, if they're running against traffic, which is legal, and they're up against the curb as best they can be and they're running in a straight line, I never would have stopped [Chesler]. I never would have stopped anybody because that's legal. This was, again, more in [the] lane of traffic and he's staggering—he looked as if he could fall down at any time." (Doc. No. 44 at 370.)

While essentially conceding this factual dispute, defendants posit that there are undisputed facts that support, as a matter of law, a finding that Martin had a reasonable suspicion to initially stop plaintiff. Defendants key in on the fact that Martin observed a car veer out of its lane to go around plaintiff, and that Martin, himself, also had to drive around plaintiff. These facts are certainly relevant as they may make it more likely that a jury would accept Martin's version of events—in which plaintiff is running away from the curb—over plaintiff's version that he was hugging the curb. By themselves, however, they do not warrant judgment, as a matter of law, in favor of defendants.[4] The Court is still left with a credibility determination.[5]

The Supreme Court's recent decision in *Tolan v. Cotton*, -- S. Ct. --, 2014 WL 1757856 (May 5, 2014) (per curiam), is instructive. After reviewing conflicting versions the events in question, the Supreme Court noted that "[t]he witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." *Id.* at *6. The competing perceptions, recollections, and potential

---

[4] Martin also testified that there was considerable traffic on the road (Doc. No. 44 at 368 [traffic was "pretty busy"].) Given the fact that Martin only saw one of the many cars on the road (other than his own) alter its path to drive around plaintiff, and in light of the fact that there exist questions of fact as to where plaintiff was in the road, the Court cannot conclude, as a matter of law, that this fact, alone, supported reasonable suspicion to make an investigatory stop.

[5] Defendants also point to Martin's recorded statement, captured in a telephone call to Upperman, wherein Martin explained to Upperman: "I stopped him more for you know, *thinking he's either drunk*, or I don't know, he *might be high with his attitude*, you know, but I don't know. Might just have him do a couple things, make sure he's good to go . . . ." (Doc. No. 71 at 1704 [citing Doc. No. 70 at ¶ 18, further citation omitted].) (emphasis in original). Defendants represent that this call is a "present sense impression," an exception to the hearsay rule, that "clearly evidences [Martin's] reasonable belief that [p]laintiff was running in the roadway while intoxicated, on alcohol or drugs, creating a risk of physical harm to him and/or the public." (Doc. No. 71 at 1704-05.) While this statement may be admissible at trial as an exception to the hearsay rule (the Court makes no such ruling at this time), and may be used to bolster Martin's credibility at trial, it does not resolve the factual disputes.

15

biases in this case render summary judgment on the issue involving the initial stop improper.

2.     The Arrest and Probable Cause

Plaintiff argues that even if Martin had reasonable suspicion to initially stop plaintiff, the investigatory stop impermissibly escalated into an unlawful seizure. (Doc. No. 68 at 1594.) "As a general rule, a law enforcement officer may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit, a crime." *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 636 (6th Cir. 2004) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964)). Probable cause to conduct a warrantless arrest exists when police have, at the moment of arrest, knowledge and facts and circumstances grounded in reasonably trustworthy information and sufficient in themselves to warrant a belief by a prudent person that an offense has been or is being committed by the suspect. *Beck*, 379 U.S. at 91 (cites omitted); *see Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979). "Courts look at this question through the lens 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005) (quoting *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)). In a § 1983 action, probable cause is generally a question of fact for the jury unless there is only one reasonable determination possible. *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (citing *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995)).

Martin testified that he relied on his initial observations of plaintiff in the street, plaintiff's inability or unwillingness to perform field sobriety tests, and plaintiff's

behavior during the administration of the tests, in concluding that there existed probable cause to arrest plaintiff for disorderly conduct and public intoxication. (Doc. No. 44 at 365, 390, 399.) The Court has already reviewed, at length, the factual disputes relating to plaintiff's behavior in the street.

Nonetheless, defendants argue that "[b]ased on the field sobriety tests, [d]efendant Martin made the reasonable determination that [p]laintiff was 'intoxicated' and, thus, had probable cause to arrest [p]laintiff for violating C.O. 509.03(b)(2)." (Doc. No. 71 at 1707.) However, there are also genuine issues of material fact relating to plaintiff's performance on the field sobriety tests and his behavior during his interactions with Martin. While Martin testified that plaintiff was unable to perform the "finger dexterity" test, plaintiff maintains that he did not understand Martin's instructions, and that Martin refused to repeat them. (*Compare* Doc. No. 44 at 376-77 *with* Doc. No. 70 at ¶ 20.) Further, though Martin states that he relied on plaintiff's refusal to perform the "turn and walk" test, plaintiff insists that he was never directed to perform that particular test. (*Compare* Doc. No. 44 at 383 *with* Doc. No. 70 at ¶ 25.)

Defendants argue that plaintiff has not established that he is an expert on the administration of field sobriety tests and cannot, therefore, challenge the manner in which Martin administered them. (Doc. No. 71 at 1707.) The Court does not view plaintiff's opposition brief as taking issue with Martin's method in performing the tests. Rather, plaintiff appears to be arguing that Martin merely administered the tests in a perfunctory manner, and relies on his own observation of Martin's actions at the scene in

17

support.[6] Plaintiff is essentially claiming that Martin did not act in good faith, and he points out objectively perceivable facts that a lay person would be capable of observing. In doing so, plaintiff has unearthed genuine issues of material fact for trial.

Plaintiff also takes issue with Martin's representation that plaintiff acted oddly at the scene. Plaintiff denies that he exhibited mood swings, or that he laughed in response to Martin's requests that he demonstrate his sobriety. Even Martin concedes that plaintiff did not exhibit other tell-tale signs of intoxication, such as slurred speech and blood shot eyes, and further admits that plaintiff did not smell of alcohol. These factual disputes call into question Martin's belief that he had probable cause to arrest plaintiff for public intoxication. As such, they preclude summary judgment in favor of defendants on Count I.[7]

B.  Equal Protection Claim

In Count II, plaintiff alleges that the same unlawful conduct of "denying the [p]laintiff freedom of movement and liberty" resulted in "a clear, express, patent violation of [p]laintiff's constitutional right of equal protection of the law. . . ." (Doc. No. 16-1 at ¶ 41.) Defendants argue that this claim is subject to summary dismissal because plaintiff has failed to allege or present any evidence that he was a member of a suspect

---

[6] To the extent plaintiff is attempting to argue that Martin did not follow proper procedure when he performed the field sobriety tests, the Court disregards the argument because plaintiff has not established that he is an expert in this area.

[7] Count IV, generically styled "Civil Rights" relies on the same alleged conduct as Count I. In fact, it merely restates verbatim the allegations contained in Count I, ending with the conclusion that the alleged conduct of defendants violated plaintiff's unidentified "civil rights[.]" (Doc. No. 16-1 at 125.) Offering no independent legal basis, this claim is, therefore, subsumed into Count I and is dismissed as duplicative.

18

class or that he was intentionally treated differently from others who were similarly situated. (Doc. No. 57-1 at 958.) Plaintiff does not respond to this argument, or oppose summary dismissal of his equal protection claim in any way. He has, therefore, abandoned this claim. *See Hicks v. Concorde Career Coll*., 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (same); *see, e.g.*, *Colston v. Cleveland Pub. Library*, No. 1:12-CV-204, 2012 WL 3309663, at *2 n.2 (N.D. Ohio Aug. 13, 2012) (deeming a claim abandoned and granting summary judgment where a plaintiff "did not respond or even mention [the] claim in her oppositions to [the] motions for summary judgment").

Further, the Court finds that plaintiff has failed to establish such a claim. Under the Equal Protection Clause, "[t]he states cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (cite omitted). In order to state an equal protection claim, a plaintiff must ordinarily "allege that a state actor intentionally discriminated against [him] because of [his] membership in a protected class." *Young v. Mahoning County, Ohio*, 418 F. Supp. 2d 948, 958 (N.D. Ohio 2005) (cite omitted). Plaintiff neither alleges, nor points to any evidence, that he was a member of a protected class.

"[T]he Supreme Court has also recognized that the Equal Protection Clause gives rise to a cause of action for a 'class of one.'" *Klimik v. Kent County Sheriff's Dep't*, 91 F. App'x 396, 400 (6th Cir. 2004) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)). However, plaintiff has failed to even allege, let alone come forward with any evidence, that he was treated differently from any similarly situated individual. His equal protection claim, therefore, is subject to dismissal. *See Assoc. of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 549 (6th Cir. 2007) ("In these 'class of one' cases, the plaintiff must 'allege that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'") (quoting *Olech*, 528 U.S. at 564) (alteration omitted); *Young*, 418 F. Supp. 2d at 960 ("The initial showing a 'class of one' plaintiff must demonstrate is that [he] was treated differently from those similarly situated.") (cites omitted).

C.  *Due Process Claim*

Count III also relies on the same seizure of plaintiff's person to allege that defendants violated his right to due process of law. (Doc. No. 16-1 at ¶ 43.) Defendants argue that "[b]ecause a more specific constitutional provision applies to [p]laintiff's claims"—the Fourth Amendment—"the Court should not consider [p]laintiff's due process claim premised upon the same seizure incident." (Doc. No. 57-1 at 961.) As was the case with his equal protection claim, plaintiff has abandoned his due process claim by failing to defend it.

Additionally, such a claim cannot survive summary judgment. Substantive due process "guarantees 'protection of the individual against arbitrary action of government.'" *Jones v. Byrnes*, 585 F.3d 971, 976 (6th Cir. 2009) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1987)). "'[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense. . . .'" *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th Cir. 2008) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)) (further quote omitted). The United States Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992) (cite omitted). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Miller v. City of Columbus*, 920 F. Supp. 807, 818 (S.D. Ohio 1996) (citing *Albright v. Oliver*, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994)). In so limiting the scope, the Supreme Court has also held that substantive due process should not be relied upon to couch a constitutional claim when a specific constitutional provision protects the right allegedly infringed. *United States v. Lanier*, 520 U.S. 259, 272 n.7, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) (citing *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

Here, plaintiff's allegation that he was subjected to an unlawful seizure is specifically covered by the Fourth Amendment. As such, this allegation must be analyzed

under the standard appropriate for Fourth Amendment claims, rather than under the general requirements of substantive due process. *See Boone v. Spurgess*, 385 F.3d 923, 933 (6th Cir. 2004) ("a specific constitutional guarantee—that all seizures be reasonable—trumps a more general guarantee—that all government action conform with substantive due process") (cite omitted). Count II, setting forth a claim for a violation of substantive due process in connection with plaintiff's arrest and detention, is dismissed.

### D.  Qualified Immunity

Defendants argue that, even assuming that issues of material fact remain as to whether probable cause existed for plaintiff's seizure, the individual defendants are entitled to qualified immunity. *See Haynes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007) ("If a government official is granted qualified immunity, he or she is immune from suit over the asserted claim.") (cite omitted). Qualified immunity shields from liability government officials performing discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Plaintiff carries the burden of proof to show that the individual defendants are not entitled to qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *see Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

In the Sixth Circuit, the test for qualified immunity typically involves a two-step inquiry: "'(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was

22

clearly established.'" *Swiecicki v. Delgado*, 463 F.3d 489, 497 (6th Cir. 2006) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005)).[8] Courts are free to take these two steps in whatever order they choose. *Pearson v. Callahan*, 555 U.S. 223, 236 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Regarding claims of false arrest, "an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (cite omitted).

The Court can dispense quickly with the second step of the qualified immunity inquiry because "[p]lainly, the federal right to be subject only to arrest upon probable cause was clearly established" at the time plaintiff came into contact with members of the Fairview Park Police Department.[9] *See Everson v. Leis*, 556 F.3d 484, 500 (6th Cir. 2009); *Gardenhire*, 205 F.3d at 313 ("the law was clearly established that, absent probable cause to believe that an offense has been committed, was being committed, or was about to be committed, officers may not arrest an individual") (internal quote omitted). The Court must now determine whether any of the officers were

---

[8] "In addition to the two steps listed above, [the Sixth Circuit] occasionally performs a third step in the qualified immunity analysis." *Id*. (citing *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005)). "When utilized, this third step requires inquiry into 'whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Id*. at 498 (quoting *Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 905 (6th Cir. 2004)).

[9] Likewise, it was well settled on the day in question that an officer may only perform an investigatory stop if he has a "reasonable suspicion" to believe that the suspect has, or is about to be, engaged in criminal activity. *Cortez*, 449 U.S. at 417; *Terry*, 392 U.S. at 30.

justified in interpreting plaintiff's conduct as violating the city ordinance prohibiting public intoxication.

*Officer Martin*

As previously discussed, there are hotly contested issues relating to whether plaintiff exhibited signs of intoxication or chemical impairment both before and after he was stopped by Martin. Defendants argue that "it was reasonable under the circumstances for [d]efendant Martin to believe that [p]laintiff was under the influence of something and that his unusual behavior while jogging in the traveled portion of a two-lane road compromised [p]laintiff's safety and the safety of others." (Doc. No. 57-1 at 956.) Yet, plaintiff's location in the road and whether he demonstrated "unusual behavior while jogging" are matters of disputed facts. Indeed, under plaintiff's version of the facts as they were known to Martin, it would have been objectively unreasonable for Martin to stop an individual who was lawfully jogging in a straight line near the curb on a city street. In fact, Martin admitted as much in his deposition. (Doc. No. 44 at 370.)

Crediting plaintiff's version of the facts, it also would have been objectively unreasonable for Martin to believe that he had probable cause to arrest plaintiff for public intoxication. While Martin testified that plaintiff was unable or unwilling to perform the field sobriety tests, and exhibited unusual behavior at the scene, plaintiff insists that Martin never asked him to perform certain tests and refused to adequately explain another. Plaintiff also flatly denies that he fell victim to mood swings or inappropriate bouts of laughter during his interactions with Martin. Under plaintiff's version of the encounter, and the undisputed fact that plaintiff exhibited no other signs of

24

intoxication or impairment, Martin could not have reasonably believed that he had probable cause to arrest plaintiff for violating the city ordinance. *See, e.g., Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 628 (6th Cir. 2004) (district court properly denied summary judgment to officers on the issue of qualified immunity for arresting plaintiff on a charge of public intoxication where plaintiff denied that his eyes were bloodshot or that he appeared unsteady on his feet); *Lambert v. City of Dumas*, 187 F.3d 931, 935-36 (8th Cir. 1999) (factual dispute as to whether plaintiff was slurring his speech and was unintelligible at the scene precluded summary judgment for officers on the issue of qualified immunity for arrest for public intoxication) These factual disputes present a genuine issue of material fact for trial on the availability of qualified immunity for defendant Martin.

*Officer Jurcak*

It is undisputed that Jurcak arrived on the scene after Martin stopped plaintiff and administered the field sobriety tests. Defendants argue that "it was reasonable for [d]efendant Jurcak to rely upon [d]efendant Martin's observations in placing [p]laintiff in the police car and transporting him to the police station." (Doc. No. 57-1 at 956.) The Court agrees.

Jurcak testified that Martin instructed him to take plaintiff into custody. (Doc. No. 57-3 at 1006.) He further testified that, prior to leaving the scene, Martin conveyed to Jurcak his observations of plaintiff in the street and on the sidewalk. (*Id*. at 1000-01.) Likewise, Martin testified that he (Martin) made the decision to arrest plaintiff (Doc. No. 44 at 365), and that he instructed Jurcak to transport plaintiff to the police

station. (*Id*. at 385.) Finally, Martin testified that, once Jurcak arrived at the station with plaintiff, Jurcak processed him. (*Id*. at 405.)   It was reasonable for defendant Jurcak to rely on the observations of Martin at the scene in making the decision to transport plaintiff to the station and process him on the arrest effectuated by Martin. *See Rogers v. Powell*, 120 F.3d 446, 453 (3d Cir. 1997) ("[A]n officer can lawfully act solely on the basis of statements issued by fellow officers if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis."), *cited with favor by Meadows v. Thomas*, 117 F. App'x 397, 403 (6th Cir. 2004). He is, therefore, "insulate[d] . . . from civil liability in the event the information relied upon [is] defective." *Hardesty v. Hamburg Twp*., 461 F.3d 646, 656 (6th Cir. 2006) (cites omitted) (in making a warrantless entry into a home, officers reasonably relied on information from law enforcement officials from another city that someone inside the dwelling was injured). Even though there may be factual disputes relating to Jurcak's own observations at the scene, the undisputed fact that Martin conveyed to Jurcak information sufficient to convince the reasonable officer that there was probable cause to arrest plaintiff means that Jurcak is entitled to qualified immunity.

   *"Lieutenant" Upperman*

    Defendant Upperman played an even more limited role in the events of November 29, 2010. It is undisputed that Upperman was not present at the scene, and he cannot be held to answer simply because he was the lieutenant in charge at the time plaintiff was brought to the station. As was the case for Jurcak, it was reasonable for

Upperman to rely on Martin's representations of plaintiff's behavior in the street and during the field sobriety tests. Upperman is entitled to qualified immunity.

### E.  Municipal Liability

Plaintiff seeks to hold the City of Fairview Park liable because it "had an unconstitutional policy in place for 26 years where arrestees such as Chesler are incarcerated indefinitely (or 'until sober') whenever, in the opinion of a single police officer, an arrestee is allegedly 'impaired' or 'intoxicated.'" (Doc. No. 68 at 1600 [deposition cites omitted].) Both Martin and Upperman confirmed that it has long been the practice of the police department to detain individuals who are believed to be intoxicated and a danger to themselves or others until they either can be released into the care of someone willing to take responsibility for them or they regain sobriety. (Doc. No. 44 at 401; Doc. No. 57-4 at 1019.) Defendants insist, however, that this practice comports with city and state law and is constitutional.

Municipalities may not be held liable under 42 U.S.C. § 1983 upon a theory of *respondeat superior*. Rather, a government entity is responsible under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" alleged by the plaintiff. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). In short, the "official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981) (quoting *Monell*, 436 U.S. at 694).

27

The police department's practice of detaining intoxicated individuals who are found to be a danger to themselves or others is firmly grounded in the City's ordinances that the local police are tasked with enforcing. As previously noted, Fairview Park Ordinance § 509.03(b)(2) makes it unlawful for a person, "while voluntarily intoxicated[,]" to "[e]ngage in conduct or create a condition that presents a risk of physical harm to the offender or another, or to the property of another." The ordinance further provides that, generally, the crime of public intoxication is a minor misdemeanor § 509.03(e)(2).

Plaintiff does not challenge the constitutionality of the ordinance. He does, however, note that "Ohio law expressly prohibits a police officer from arresting a person for committing a minor misdemeanor, except in certain situations listed in the statute." (Doc. No. 68 at 1597 [citing Ohio Rev. Code § 2935.26(A)].) This is a true statement of law. One of the statutory exceptions to the general rule prohibiting the incarceration of individuals for minor misdemeanors is, however, applicable here—the offender "is unable to provide for his own safety." Ohio Rev. Code § 2935.26(A)(1). Under this exception, officers are entitled to take someone into custody for committing a minor misdemeanor, such as public intoxication, where the individual is unable to provide for his own safety. By extension, officers are authorized to detain someone in police custody until arrangements are made, or sobriety is reached, such that the individual's safety can be ensured.

Plaintiff takes issue with the City's practice, complaining that the determination that an individual's voluntary intoxication renders him unable to provide

for his own safety is often left to a solitary officer in the field. Yet, he fails to identify what part of the practice of delegating the responsibility of enforcing this ordinance to an officer in the field is unconstitutional, Of course, it would be law enforcement officers in the field who would come into contact with citizens who may be intoxicated or impaired. Courts routinely affirm the constitutionality of arrests for public intoxication based on one officer's observations. *See, e.g., United States v. Pryor*, 174 F. App'x 317, 319 (6th Cir. 2006) (officer had probable cause to arrest defendant for public intoxication where officer observed that defendant was stumbling, slurring his speech, and he smelled of alcohol); *Schliewe v. Toro*, 138 F. App'x 715, 721 (6th Cir. 2005) (officer had probable cause to arrest plaintiff for intoxication and creating a risk to oneself and others, such that the arrest could not support a § 1983 claim, where officer observed that plaintiff was agitated, confused, and covered in blood).

Plaintiff's real complaint is not the existence of the police department's policy. Instead, it is clear that the true source of his injury is the manner in which Martin carried out the policy. It is the arrest—allegedly without probable cause—that plaintiff cites as the reason his constitutional rights were violated. Under these circumstances, the only possible way to hold the City liable for Martin's actions would be to employ a *respondeat superior* theory, which is not permissible. *See Monell*, 436 U.S. at 694. Because the existence of the policy was not the "moving force" behind the alleged constitutional violation, plaintiff cannot hold the City liable for it. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) ("To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred

because of a municipal policy or custom.") The record does not support a basis for municipal liability, and the City is entitled to summary judgment on plaintiff's Fourth Amendment claim.

### F.  State Law Claims and Immunity

Plaintiff also raises state law claims for intentional infliction of emotional distress (Count VI) and abuse of process (Count VII). (Doc. No. 16-1 at 126-28.) In his brief in opposition to summary judgment, plaintiff represents that "[u]pon due consideration, Chesler withdraws the abuse of process claim." (Doc. No. 68 at 1601.) This leaves the claim for emotional distress. The City and the individual defendants argue that they are immune from this claim under Ohio Rev. Code § 2744. Plaintiff does not dispute that the City qualifies for immunity under § 2744.02(A)(1), and that there are no exceptions under § 2744.02(B) that would defeat the City's right to immunity. (Doc. No. 68 at 1602.) Thus, plaintiff concludes that the City "is entitled to summary judgment on the intentional infliction of serious emotional distress claim." (*Id*. at 1602-03.) The Court agrees, and this claim is dismissed as against the City. *See generally Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 744 (N.D. Ohio 2008) ("Ohio courts have held that political subdivisions are entitled to immunity under § 2744.02 for the intentional torts committed by their employees.") (collecting cases). The Court now turns to consider the claim as it pertains to the individual defendants.

Ohio Rev. Code § 2744.03 provides immunity from tort actions for employees of political subdivisions acting in a governmental or proprietary function, and lays out specific exceptions. *Chesher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007).

Specifically, immunity is not available to an employee who has acted "outside the scope of [his] employment[,]" acted "with malicious purpose, in bad faith, or in a wanton or reckless manner[,]" or unless "liability is expressly imposed upon the employee by a section of the Revised Code." Ohio Rev. Code § 2744.03(A)(6)(a)-(c). All of the acts that form the basis for plaintiff's claim for emotional distress were performed in connection with a "governmental function,"[10] a fact which plaintiff concedes. (Doc. No. 68 at 1602.)

It is plaintiff's position that there is ample evidence of malice sufficient to defeat statutory immunity for the individual officers. The entirety of his argument against immunity is:

> Certainly stopping a citizen who was not violating the law in any way is not within the scope of Martin's employment and was not undertaken in good faith. Chesler's evidence is that Martin was enraged when he stopped him while driving his private vehicle. Martin did not develop any competent evidence to show that Chesler was violating the law or was subject to arrest. He did not have probable cause and neither did Jurcak. After falsely arresting Chesler, Martin, Jurcak and Upperman then deprived Chesler of his liberty in bad faith and maliciously because he had the temerity to contact the mayor of Fairview Park to complaint [sic] about Martin's mistreatment of him.

(Doc. No. 68 at 1603.)

In order to support a claim for the tort of intentional infliction of emotional distress under Ohio law, four elements must be proved: (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) that the actor's conduct was extreme and outrageous, that it went beyond all possible bounds of decency and that it

---

[10] Under Ohio Rev. Code § 2744.01(C)(2)(a), "government functions" include the operation of law enforcement personnel.

31

can be considered as utterly intolerable in a civilized community; (3) that the actor's actions were the proximate cause of the plaintiff's injury; and (4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it. *Pyle v. Pyle*, 11 Ohio App. 3d 31, 34, 463 N.E.2d 98 (Ohio Ct. App. 1983). To be "extreme" and "outrageous," conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 6 Ohio St. 3d 369, 375, 453 N.E.2d 666 (1983) (internal quote omitted).

The fourth prong of the test—serious mental anguish—requires a showing that a "reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case. . . . A non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia." *Paugh v. Hanks*, 6 Ohio St. 3d 72, 78, 451 N.E.2d 759 (1983) (internal cites omitted). "Serious emotional distress is emotional injury which is both severe and debilitating." *Hout*, 550 F. Supp. 2d at 744 (citing *Paugh*, 6 Ohio St. 3d at 78). A plaintiff "claiming severe and debilitating emotional injury must present some guarantee of genuineness in support of [his] claim, such as expert evidence, to prevent a court from granting summary judgment in favor of the defendant." *Knief v. Minnich*, 103 Ohio App. 3d 103, 108, 658 N.E.2d 1072 (Ohio Ct. App. 1995) (cite omitted).

Here, plaintiff offers no expert or other evidence as to any emotional

distress he suffered, and he has failed to seek professional treatment for any alleged emotional distress. (Doc. No. 63-1 at 1252-54.) Further, he is not seeking reimbursement for any medical bills as a result of the incident at issue, and there is no evidence that he incurred any. (*Id* at 1255.) Without evidence of a physical or emotional injury, let alone one that is "severe and debilitating," the individual defendants are entitled to summary judgment on this claim. As such, the Court need not address whether the individual defendants would also be statutorily immune from suit.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court GRANTS, in part, defendants' joint summary judgment motion. All claims against the City of Fairview Park are DISMISSED. Count II (equal protection), Count III (due process), Count IV (civil rights), Count VI (intentional infliction of emotional distress), and Count VII (abuse of process) are also DISMISSED as against defendants Martin, Jurcak, and Upperman. The Court also finds that defendants Jurcak and Upperman are entitled to qualified immunity on Count I (Fourth Amendment seizure). Count I and Count V (declaratory judgment) survive summary judgment as against defendant Martin only.

**IT IS SO ORDERED**.

Dated: May 9, 2014

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**